UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

RANDY BEASLEY,

                Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS et al.,

                Defendants.

_____/

Case No. 2:25-cv-261

Honorable Phillip J. Green

### __OPINION__

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. In a separate order, the Court granted Plaintiff leave to proceed *in forma pauperis*. (Order, ECF No. 10, PageID.76.)  Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States Magistrate Judge.  (ECF No. 1, PageID.11.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court is required to conduct this initial review prior to the service of the complaint.  *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997).  Service of the complaint on the

named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States Magistrate Judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that

2

"[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a consent from the defendants[; h]owever, because they had not been served, they were not parties to this action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan.  The events about which he complains occurred at that facility and the Baraga Correctional Facility (AMF) in Baraga, Baraga County, Michigan.  Plaintiff sues the MDOC as well as the following AMF staff: Guard K. Beck, Sergeant Unknown Williams, Warden Terry Wilkins, Assistant Deputy Warden (ADW) Unknown Nurkala, Resident Unit Manager (RUM) T. Wilson, and Prison Counselor (PC) K. Miller.  (Compl., ECF No. 1, PageID.1–3.)

Plaintiff's complaint alleges that on February 9, 2025, while in AMF's general population, he was harassed, threatened and "called names by . . . [Defendant] Beck."[2] (*Id.*, PageID.4.)  Plaintiff alleges that Defendant Beck "was calling [him] n***** and she stated that she was going to set [him] up with a falsified misconduct report just because she can and get away with it." (*Id.*)  Plaintiff asked Defendant Beck to "please leave [him] alone because [he is] trying to go home." (*Id.*)  Plaintiff claims that Defendant Beck falsified a misconduct report for threatening behavior and, as a

---

[2] In this opinion, the Court corrects the punctuation, spelling, and abbreviations in quotations from Plaintiff's filings.

result, "they locked [his] cell door because of this false claim" and placed Plaintiff on top lock status. (*Id.*)

The next day, February 10, 2025, Defendant Williams "came to review [him] on the falsified threatening behavior [misconduct report]." (*Id.*)  Plaintiff told Defendant Williams that Defendant Beck's allegations were false and that the prisoner number and name on the misconduct report were incorrect. (*Id.*)  Defendant Williams "still support[ed Defendant] Beck['s] false misconduct [report]," found Plaintiff guilty of the misconduct charge, and placed Plaintiff on top lock. (*Id.*, PageID.4, 5.)

While on toplock from February 8, 2025, through March 3, 2025, Plaintiff alleges that he could not "come out of [his] cell" "for educational program, religious program, yard, store, food, phone," visits, "group therapy, school, core programming, law library, work and assignments," that he was "kicked . . . out of [his] educational program," and he "was not able to shower for 21 days." (*Id.*, PageID.4–6.)  During the time he was on top lock status, on an unspecified date, Plaintiff "talked to [Defendant] Warden Terry Wilkins" because Wilkins "knew about the violation [with respect to the issuance of the misconduct charge] . . . and [Plaintiff] told him [Plaintiff] had not had a hearing and no investigator had come to see [Plaintiff]." (*Id.*, PageID.5, 6.) Plaintiff then submitted a grievance about the matter. (*Id.*, PageID.5.)  In response to the grievance, non-party Hearing Investigator (HI) Redinger indicated that he had "pulled" the threatening behavior misconduct report on March 3, 2025, meaning that "it therefore did not go through the hearing process." (*Id.*, PageID.5, 6.)

On March 3, 2025, "the day they took [Plaintiff] off of top lock, [Plaintiff] got into a fight . . . so they put [him] back into [his] cell." (*Id.*, PageID.6.)  Plaintiff alleges that he was then "waiting on Lansing SCC [Security Classification Committee] completion to find out if SCC [was] going to send [him] to segregation or not."  (*Id.*) According to Plaintiff, on or around April 1, 2025, SCC did not approve sending him to segregation but that he was still "removed from general population and placed in segregation."  (*Id.*)  Plaintiff claims that "[t]his was out of retaliation because of that false misconduct that [Defendant] K. Beck wrote."  (*Id.*)

Plaintiff alleges that he talked to Defendants Miller, Nurkala, Wilson, and Wilkins about being in segregation, telling them that he had "not gotten a ticket to be sent to segregation, nor did Lansing SCC approve of [Plaintiff] to go to segregation," and Defendants Miller, Nurkala, Wilson, and Wilkins all told Plaintiff, "the reason for [him] . . . be[ing] in segregation [was] threatening behavior."  (*Id.*, PageID.6, 7.)  Plaintiff claims the "threatening behavior" referred to by these Defendants is his "pulled" misconduct report from Defendant Beck.  (*See id.*)

Plaintiff later learned that on April 2, 2025, he had been approved for the START Program and that he was being held in segregation "awaiting alternate placement [in the] START Program."  (*Id.*, PageID.7.)  On an unknown date, Plaintiff was transferred to Ionia Correctional Facility (ICF) and placed in the START Program.  (*See id.*, PageID.2 (setting forth the present place of confinement listed as ICF).)  Plaintiff claims he should not be in the START Program because he "never asked to be in this program, [he] never sign[ed] anything to be in this program," he

does not have a mental illness, he is "not OPT," he does not take mental health medications, and he did not receive a Class I misconduct.  (*Id.*, PageID.8.)

Plaintiff alleges that Defendants placed him into segregation on "all lies and false documents," (*id.*, PageID.9), because the reasoning in his Segregation Behavior Reviews changes over time.  (*See id.*, PageID.9–10.)  In the May 2025 Segregation Behavior Review, Defendants Miller, Nurkala, Wilson, and Miller cite Plaintiff as "a serious threat to [the] physical safety of others."  (*Id.*)  Then in June 2025, Defendants Miller, Nurkala, Wilson, and Miller wrote that Plaintiff was unable "to be managed with GP [general population] . . . as their reason for [his] segregation classification."  (*Id.*, PageID.10.)  Plaintiff also alleges falsification of these documents because on May 9, 2025, Defendant Wilkins's Segregation Behavior Review stated that Plaintiff was in segregation "due to the threatening behavior that was written at MBP . . . which was obviously a false document because [Defendant] Beck wrote it on [Plaintiff] here at Baraga Correctional Facility."  (*Id.*)  Plaintiff claims that he is "being h[eld] in segregation under [a] false document and for no reason, they took all of [his] privileges [like] school, core programming, law library, work assignments, religious services, store, and friends and family [visits], package orders, and phone."  (*Id.*, PageID.7.)

Plaintiff claims that he has "been in segregation for eight months now and [he is] still in segregation."  (*Id.*, PageID.8.)  Plaintiff further states he is only allowed to purchase items deemed mandatory by the prison, his "movement is in restraints everywhere [he] goes . . . [he] gets two personal phone calls. No kiosk access. No

Player access. No J-Pay. [He] gets three showers [per] week . . . They took all of [his] property and privileges from [him]." (*Id.*)

Plaintiff concludes that the Defendants' "actions, inactions, and/or omissions [are] willful, wanton, intentional, cruel, unusual, punitive, deliberate, indifferent, gross[ly] negligent, arbitrary, onerous, conspiratorial, retaliat[ory], etc. and [are] in violation of Plaintiff's federal and state constitutional rights . . . and under the applicable federal and state statutes, laws, policies, procedures, rules and regulations." (*Id.*, PageID.10.)

Based on the foregoing allegations, the Court construes Plaintiff's complaint to raise First Amendment retaliation claims, and Eighth and Fourteenth Amendment claims for the conditions of and his placement in top lock, segregation, and START programs. The Court also construes Plaintiff's complaint to raise Eighth Amendment claims for verbal harassment and Fourteenth Amendment due process claims related to his access to the grievance system. As relief, Plaintiff seeks declaratory relief and damages. (*Id.*, PageID.10–11.)

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must

determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.   Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.   Defendant MDOC

Plaintiff names the MDOC as a Defendant.  (Compl., ECF No. 1, PageID.1.) As an initial matter, Plaintiff does not name Defendant MDOC in the body of his

complaint.  *See Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights).  Defendant MDOC is subject to dismissal for this reason alone.

Moreover, § 1983 expressly requires that a named defendant be a "person."  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  However, the State of Michigan (acting through the MDOC) is not a "person" within the meaning of § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (holding a state is not a "person"); *Parker v. Mich. Dep't of Corr.*, 65 F. App'x 922, 923 (6th Cir. 2003) (citing *Will* and holding that the MDOC is not a "person.").

Accordingly, for these reasons, Plaintiff fails to state any claim against Defendant MDOC upon which relief may be granted.

### B.    First Amendment Claims

Plaintiff alleges that his right to be free from retaliation under the First Amendment was violated.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) the plaintiff was engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a plaintiff must be able to show that the exercise of the protected right was a substantial or

10

motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

### 1.    Protected Conduct

With respect to the first element of a First Amendment retaliation claim, the Court construes two allegations from Plaintiff to imply protected conduct: Plaintiff's verbal complaint to Defendant Beck regarding her use of a racial epithet, (Compl. ECF No. 1, PageID.4), and Plaintiff's submission of written grievances. (*Id.*, PageID.5, 6.)  A prisoner has a right to file "non-frivolous" grievances against prison officials on his own behalf, whether written or oral. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 298–99 (3d Cir. 2016).

Plaintiff alleges that after Defendant Beck used the racial slur, Plaintiff told her to leave him alone. (Compl., ECF No. 1, PageID.4.)  Plaintiff also submitted written grievances regarding the misconduct report from Defendant Beck on an unspecified date between February 9, 2025, and March 3, 2025. (*Id.*, PageID.5, 6).

At this stage of the proceedings, the Court assumes, without deciding, that Plaintiff's statement to Defendant Beck and written grievance were protected conduct for the purposes of his First Amendment claim.

### 2.    Adverse Action and Retaliatory Motive

Next, to establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular

11

plaintiff reacted.   The relevant question is whether the defendant's conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence.  *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002).   Finally, to satisfy the third element of a retaliation claim, Plaintiff must allege facts that support an inference that the alleged adverse action was motivated by the protected conduct. *Thaddeus-X*, 175 F.3d at 394.   The Court addresses the misconduct ticket and placement into segregation below.

### a.    Misconduct Ticket

Plaintiff alleges that on February 9, 2025, Defendant Beck "was calling [him] n***** and she stated that she was going to set [him] up with a falsified misconduct report just because she can and get away with it."  (Compl., ECF No. 1, PageID.4.) At some point after this, Plaintiff asked Defendant Beck to "please leave [him] alone because [he is] trying to go home."  (*Id.*)  Thereafter, at an unspecified time, Plaintiff received a misconduct ticket for threatening behavior.  (*Id.*)

The issuance of a misconduct ticket constitutes adverse action.  However, with respect to the issuance of the misconduct ticket, Plaintiff's retaliation claim, premised on Plaintiff's oral complaint as the protected conduct, fails at the third element because he fails to allege any facts to suggest that the ticket for threatening conduct was received because Plaintiff had verbally complained to Defendant Beck. Specifically, Plaintiff's own allegations show that *before* Plaintiff engaged in any protected conduct, Defendant Beck had told Plaintiff that the reason she would write Plaintiff "a falsified misconduct report [was] just because she can and get away with

12

it," not because he had engaged in protected conduct. (*Id.*)  Indeed, Defendant Beck made this statement to Plaintiff before he had engaged in any protected conduct.

Furthermore, although Defendant Beck later issued Plaintiff a misconduct report after Plaintiff orally complained to her, suggesting temporal proximity, the Sixth Circuit has been reluctant to find that temporal proximity between the protected conduct and an official's adverse conduct, standing alone, is sufficient to establish a retaliation claim.  *Compare Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)), *and Briggs v. Westcomb*, No. 19-1837 (6th Cir. Mar. 10, 2020) (unpublished) (holding that allegations of temporal proximity were sufficient where the filing of retaliatory misconduct by correctional officers occurred six days after Plaintiff filed a grievance against a medical provider, but only one day after the provider learned of the grievance), *with Hill*, 630 F.3d at 476 (discussing that the Sixth Circuit has been reluctant to find that temporal proximity alone shows a retaliatory motive).  Here, the order of events is as follows: Defendant Beck "was calling [Plainitff] n***** and she stated that she was going to set [him] up with a falsified misconduct report just because she can and get away with it"; then, Plaintiff told Defendant Beck to "please leave [him] alone because [he is] trying to go home," which the Court has construed as protected conduct; and, thereafter, at some other later point, Defendant Beck issued Plaintiff a misconduct charge, which Plaintiff alleges was false. (Compl., ECF No. 1, PageID.4.)  Plaintiff's only allegation regarding Defendant Beck's motive in issuing the misconduct charge shows that Beck was motivated to issue the false

13

misconduct charge "just because she can and get away with it." (*Id.*)  Under these circumstances, despite the temporal proximity between the oral complaint and the issuance of the misconduct report, Plaintiff alleges no *facts* from which to reasonably infer that Defendant Beck's issuance of the false misconduct charge was motivated by any protected conduct because Defendant Beck told Plaintiff she would issue him a false misconduct charge "just because she can and get away with it" *before* Plaintiff had engaged in any protected conduct.  (*See id.*)  Under these circumstances, a vague suggestion of temporal proximity alone is insufficient to show a retaliatory motive. *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987).

Furthermore, with respect to the issuance of the misconduct ticket, Plaintiff's retaliation claim, premised on Plaintiff's grievance as the protected conduct, also fails on the third element because Plaintiff's grievance was filed after the issuance of the misbehavior ticket.  (Compl. ECF No. 1, PageID.4, 5.)  Therefore, the written grievance was not a motivating factor behind Defendant Beck's actions, as it occurred after the misconduct ticket was issued.  *See Thaddeus-X*, 175 F.3d at 394.

Accordingly, for these reasons, Plaintiff's First Amendment retaliation claim premised on the issuance of a misbehavior ticket will be dismissed for failure to state a claim.

### b.    Placement into Segregation

Plaintiff alleges that after Defendant Beck "falsified a threatening misconduct [report]."  (Compl., ECF No. 1, PageID.4), Plaintiff was left in top lock for 21 days because Defendant Beck "had other officers [such as Defendant Williams] . . . support her false claim." (*Id.*)  Plaintiff was then kept in segregation by Defendants Wilkins,

14

Nurkala, Wilson, and Miller for an unknown period of time, pending his placement into the START Program.  (*See id.*, PageID.6–7.)  Although Plaintiff's allegations do not specify when his segregation placement ended and the START Program began, he alleges both placements are based on "false documents."  (*Id.*, PageID.9, 10.)

At this stage of the proceedings, the Court assumes, without deciding, that placement into segregation or a program like the START Program would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights.  *See Thaddeus-X*, 175 F.3d at 396.

However, Plaintiff's retaliation claim fails on the third element because Plaintiff alleges no *facts* to show that the Defendants acted due to Plaintiff's verbal or written complaints.  As discussed above, although temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive,'" the Sixth Circuit has been reluctant to find that temporal proximity between the protected conduct and an official's adverse conduct, standing alone, is sufficient to establish a retaliation claim.  *Compare Muhammad*, 379 F.3d at 417–18 (citation omitted), *with Hill*, 630 F.3d at 476 (discussing that the Sixth Circuit has been reluctant to find that temporal proximity alone shows a retaliatory motive).

Here, as detailed above, Plaintiff makes conclusory assertions that Defendants Williams, Wilkins, Nurkala, Wilson, and Miller retaliated against him because he verbally complained to Defendant Beck.  Specifically, Plaintiff alleges that Defendants Wilkins, Nurkala, Wilson, and Miller informed Plaintiff that his

15

threatening behavior was a reason for placement into segregation, but Plaintiff alleges insufficient facts to show that the threatening behavior was related to Defendant Beck or that the alleged adverse actions were motivated by Plaintiff's protected conduct. Plaintiff's allegations describe other events and behavior concerns documented in at least three Segregation Behavior Reviews as reasons for his placement in segregation or the START Program. (Compl., ECF No. 1, PageID.7, 9–10.) Under these circumstances, Plaintiff's suggestion of temporal proximity alone and conclusory statements regarding false documents or retaliation are insufficient to show a retaliatory motive. *Murphy*, 833 F.2d at 108 ("[A]lleging merely the ultimate fact of retaliation is insufficient."); *see Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (holding that in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial" (internal quotation marks omitted)); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims [that will survive § 1915A screening]." (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998))).

### C. Eighth Amendment Claims

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment bars punishments that are not only physically barbaric, but also those which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton

16

infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976) (internal quotation marks omitted).  To establish an Eighth Amendment claim, the prisoner must show that he was deprived of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

Not "every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey v. Wilson*, 832 F.2d 950, 954 (1987).  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*  Conditions that are restrictive or even harsh, but are not cruel and unusual under contemporary standards, are not unconstitutional. *Rhodes*, 452 U.S. at 347.  Thus, federal courts may not intervene to remedy conditions that are merely unpleasant or undesirable.

For a prisoner to state an Eighth Amendment claim, the prisoner must show that he faced a sufficiently serious risk to his health or safety and that defendants acted with "'deliberate indifference' to inmate health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).  The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37.  To satisfy the objective prong,

17

an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.  Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.  As detailed below, Plaintiff's allegations fail to show the necessary components of an Eighth Amendment claim.

### 1.    Conditions of Confinement in Top Lock

Plaintiff alleges he was "kicked . . . out of [his] educational program, religious program, yard, store, food, [and] phone" when he was placed on top lock on February 9, 2025.  (Compl., ECF No. 1, PageID.5.)  Plaintiff further alleges that he should have been able to access "regular showers, visits, including video visits, medical care, including individual and group therapy, school, core programming, law library, work assignments, activities including group religious services, store, [and] family package orders," but he received "nothing during the 21 days on top lock."  (*Id.*, PageID.6.)  Plaintiff states that he could not shower for 21 days.  (*Id.*, PageID.4.)  Plaintiff further alleges that Defendant Beck "had other officers here at Baraga retaliate on [him]" (*id.*, PageID.5), and that he should have been found not guilty and released from top lock by Defendant Williams on February 10, 2025.  (*See id.*, PageID.4.)  Plaintiff also alleges that he "talked" to Defendant Wilkins because he "knew about the violation . . . and [Plaintiff] told him [he] had not had a hearing and no investigator had come to see [him]."  (*Id.*, PageID.5.)  Plaintiff's complaint contains no allegations that any

18

Defendant was personally responsible for any conditions of his confinement while in top lock.  (*See generally* Compl., ECF No. 1).

As an initial matter, the loss of privileges that Plaintiff describes as being imposed while in top lock are restrictive conditions of confinement, but are not cruel and unusual.  *See Rhodes*, 452 U.S. at 347.  Placement in segregation or the imposition of other restrictions, such as top lock, are routine discomforts that are "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson*, 503 U.S. at 9 (quoting *Rhodes*, 452 U.S. at 347).  Although it is clear that Plaintiff was denied certain privileges as a result of his placement on top lock, with the exception of being denied a shower for 21 days, he does not allege or show that he was denied any basic human need.  The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of segregation cannot establish an Eighth Amendment violation.  *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008).

As to Plaintiff's allegation that he was denied a shower for 21 days, (*id.*, PageID.4), even if the Court assumes, without deciding, that the denial of a shower for that length of time meets the objective component for an Eighth Amendment claim, *see Evans*, 427 F. App'x at 443, Plaintiff fails to connect that allegation to any of the named Defendants. Plaintiff alleges that Defendant Beck "had other officers . . . retaliate on [him]," that he should not have been left in top lock after Defendant Williams' review of the misconduct report, and that Plaintiff talked to Defendant

19

Wilkins about the lack of a hearing on the misconduct report.[3] (Compl., ECF No. 1, PageID.5.)  Plaintiff's allegations against Defendant Beck are conclusory and provide no factual basis for liability against Defendant Beck for the conditions of top lock. Similarly, Plaintiff's allegations against Defendant Williams and Wilkins involve Plaintiff's objections to the lack of a hearing on the misconduct report.  Plaintiff fails to allege any facts to show that any Defendant had knowledge or was directly involved in depriving Plaintiff of a shower for 21 days.

As a result, Plaintiff fails to state an Eighth Amendment claim against Defendants for the conditions of confinement while in top lock.

### 2. Conditions of Confinement in Segregation and START Program

Plaintiff alleges that on April 2, 2025, he was "removed from general population and placed in segregation." (Compl., ECF No. 1, PageID.6.)  At some point, Plaintiff was placed in the START Program (*see id.*, PageID.8 ("I never asked to be in this program")), and was transferred to ICF, his place of present confinement.  (*See*

---

[3] To the extent that Plaintiff seeks to hold Defendant Wilkins and Williams liable due to their supervisory positions at AMF, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676 (2009); *Monell*, 436 U.S. at 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

20

*id.*, PageID.2.)  Plaintiff at times refers to his placement in segregation and the START program interchangeably.  (*See id.*, PageID.7–10.)  Plaintiff claims that "they took all of [his] privileges [like] school, core programming, law library, work assignments, religious services, store, and friends and family [visits], package orders, and phone."  (*Id.*, PageID.7.)  He states his commissary purchases are limited, "movement is in restraints everywhere [he] goes . . . [he] gets two personal phone calls. No kiosk access. No Player access. No J-Pay. [He] gets three showers [per] week . . . They took all of [his] property and privileges from [him]."  (*Id.*, PageID.10.)

Again, placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'"  *Hudson*, 503 U.S. at 9 (quoting *Rhodes*, 452 U.S. at 347).  Plaintiff does not allege or show that he is being denied basic human needs and requirements.  Plaintiff has also not alleged that his confinement in segregation or the START Program is more severe than the typical conditions of segregation.  *See e.g. Wallace v. Baldwin*, 895 F.3d 481, 485 (7th Cir. 2018).  Therefore, the restriction of movement and privileges that Plaintiff describes because of his placement in segregation and the START Program cannot establish an Eighth Amendment violation.  *See Evans*, 427 F. App'x at 443; *Harden-Bey*, 524 F.3d at 795.

As a result, Plaintiff fails to state an Eighth Amendment claim against Defendants for the conditions of confinement while in segregation and the START program.

### 3.    Verbal Harassment Claims

The Court construes Plaintiff's allegations regarding Defendant Beck's statements involving a racial slur as seeking to hold Defendant Beck liable for verbal harassment.  (*See generally* Compl., ECF No. 1.)

Although unprofessional, allegations of verbal harassment or taunts by prison officials toward an inmate do not constitute punishment within the meaning of the Eighth Amendment.  *Ivey*, 832 F.2d at 955 (per curiam).  Additionally, allegations of verbal harassment do not rise to the level of unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  *See id.*; *see Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (holding that harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits).

Accordingly, Plaintiff fails to state an Eighth Amendment claim premised on verbal harassment.

### D.    Fourteenth Amendment Claims

#### 1.    Issuance of the Misconduct Report and Placement into Top Lock, Segregation, and START Program

The Court construes Plaintiff's complaint to raise a Fourteenth Amendment due process claim regarding the misconduct report and his subsequent placement into top lock, segregation, and the START program.  Plaintiff alleges that Defendant Beck "falsified a threatening misconduct [report]" and that he was left in top lock for 21 days without a hearing after Defendant Williams' review.  (Compl., ECF No. 1, PageID.4.)  When Plaintiff was released from top lock, he was in a fight and subsequently reviewed for placement into segregation.  (*Id*., PageID.6.)  Although

22

SCC denied Plaintiff's placement into segregation, he was kept in segregation for an unknown period of time, pending his placement into the START Program.  (*See id.*, PageID.6–7.)  Plaintiff received Segregation Behavior Reviews written by Defendants Wilkins, Nurkala, Wilson, and Miller which cited Plaintiff as "a serious threat to [the] physical safety of others" and "threatening behavior" in April and May 2025.  (*Id.*, PageID.7, 9–10.)  In June 2025, Defendants Wilkins, Nurkala, Wilson, and Miller wrote in their Segregation Behavior Review that Plaintiff was unable "to be managed with GP [general population] . . . as their reason for [his] segregation classification." (*Id.*, PageID.10.)

### a.    Procedural Due Process

"The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005).  To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient . . . ." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

As an initial matter, the Supreme Court has repeatedly held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228–

23

29 (1976).  Further, the United States Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner.  *See Meachum*, 427 U.S. at 225.

In *Sandin v. Conner*, the Supreme Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause.  515 U.S. 472, 484 (1995).  According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).  In *Sandin*, the Court held that regardless of the mandatory language of the prison regulations, the inmate did not have a liberty interest because his placement in administrative segregation did not constitute an atypical and significant hardship within the context of his prison life. *Sandin*, 515 U.S. at 484; *see also Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997). Without a protected liberty interest, a plaintiff cannot successfully claim that his due process rights were violated because "[p]rocess is not an end in itself."  *Olim*, 461 U.S. at 250.

Plaintiff's allegations do not support an inference that the duration of his sentence has been affected by his placements in top lock, segregation, or the START program.  And, typically, segregation stays must extend for a significant amount of time, such as more than a year, before they are considered "atypical and significant"

24

such that a prisoner is entitled to due process protection.  *See, e.g., Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest); *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, i.e., three years without an explanation from prison officials, implicates a liberty interest).

Plaintiff's eight months in segregation, without more to suggest anything "atypical," is far short of the extended placements that are deemed atypical and significant.  *Sealey v. Giltner*, 197 F.3d 578, 589–90 (2d Cir. 1999) (holding that 101 days in SHU confinement, though unpleasant and severe, was not atypical and significant); *Jenkins v. Murray*, 352 F. App'x 608, 610 (3d Cir. 2009) (holding that prisoner's three-month confinement in administrative segregation did not constitute an atypical or significant hardship); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (holding that a six-month stay in administrative segregation was not atypical and significant); *Hernandez v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008) (holding that 12 months in administrative lockdown was not atypical and significant); *Finley v. Huss*, 102 F.4th 789, 813 (6th Cir. 2024) (noting that the prisoner's three months in administrative segregation, without more, was not atypical and significant and did not implicate a liberty interest); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir.), *cert. denied*, 522 U.S. 848 (1997) (finding that a six–month term in administrative segregation was not "atypical and significant," without no discussion of the conditions

25

in segregation); *Crowder v. True*, 74 F.3d 812, 815 (7th Cir. 1996) (holding that placement of inmate in non-disciplinary segregation for three months did not create a liberty interest); *Ballinger v. Cedar Cnty. Mo.*, 810 F.3d 557, 563 (8th Cir. 2016) (holding that whether the duration in administrative segregation was three months, as the district court found, or one year, as the prisoner argued, it was not an atypical and significant hardship); *Shields v. Cline*, 829 F. App'x 321, 324 (10th Cir. 2020) (concluding that five months in administrative segregation was not atypical and significant).   Under the authorities cited above, Plaintiff's allegations do not show that the conditions in top lock, segregation, or the START program constitute atypical or significant hardships.

Moreover, even if Plaintiff has alleged the loss of a protected liberty interest, he would not state a due process claim because he fails to show that he did not receive all the process due to him.  *See generally Wolff v. McDonnell*, 418 U.S. 539 (1974) (setting forth the minimum process required for prison disciplinary proceedings that implicate a liberty interest).  A due process claim "is not complete unless and until the State fails to provide due process." *Zinermon v. Burch,* 494 U.S. 113, 126 (1990). The Supreme Court has indicated that "[p]rison officials must engage in some sort of periodic review of the confinement of . . . inmates [in segregation]." *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983).  "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements."  *Id.* However, the decision to continue confinement must be supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 454 (1985).  "This requirement balances the

procedural rights of prisoner against the need of prison officials to have freedom to operate their facilities on a day-to-day basis." *Harris,* 465 F. App'x at 484. In short, where an inmate's confinement in segregation implicates a liberty interest, he is entitled to a "periodic review of his confinement, supported by some evidence or indicia of reliability." *Id.* at 485; *see also Selby*, 734 F.3d at 559–60 (holding that the mere formality of holding reviews is not sufficient; whether a given process is meaningful and adequate is a question of fact).

Here, Plaintiff has received at least three Segregation Behavior Reviews from Defendants Wilkins, Nurkala, Wilson, and Miller. (Compl., ECF No. 1, PageID.7, 9–10.) Plaintiff acknowledges that on the day he was released from top lock, he was in a fight (*id.*, PageID.6) and that he was then placed on segregation status and approved for the START Program. (*Id.*, PageID.7.) Although Plaintiff disagrees with the reasons for his confinement in segregation and the START Program provided by Defendants Wilkins, Nurkala, Wilson, and Miller in their Segregation Behavior Reviews, he has not alleged that he has not received the process due to him. *See Harris,* 465 F. App'x at 485.

Accordingly, Plaintiff has failed to state a procedural due process claim upon which relief can be granted.

### b. Substantive Due Process

The Court also construes Plaintiff's allegations to assert a violation of his substantive due process rights under the Fourteenth Amendment, which prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. "Substantive due process 'prevents the government

27

from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). "Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'" *Range v. Douglas v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952))). The Sixth Circuit has held that framing an inmate by planting evidence may violate substantive due process where a defendant's conduct shocks the conscience and constitutes an "egregious abuse of governmental power." *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988), *overruled in other part by Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999); *see also Davis v. Gallagher*, No. 1:16-cv-1405, 2016 WL 7403941, *4 (W.D. Mich. Dec. 22, 2016); *Robinson v. Schertz*, No. 2:07-cv-78, 2007 WL 4454293 (W.D. Mich. Dec. 14, 2007).

"Where a particular [a]mendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that [a]mendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 269 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989) (holding that the Fourth

28

Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens, and the Eighth Amendment provides the standard for such searches of prisoners), *overruled on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001)).  If such an amendment exists, the substantive due process claim is properly dismissed.  *Resurrection Sch. v. Hertel*, 11 F.4th 437, 461–462 (6th Cir. 2021) (holding that the Free Exercise Clause constituted the textual source for plaintiffs' claim, precluding a substantive due process claim) (citing *Albright*, 510 U.S. at 273); *Heike v. Guevara*, 519 F. App'x 911, 923 (6th Cir. 2013).

In this case, there are specific constitutional amendments that apply to Plaintiff's claims.  The Fourteenth Amendment Procedural Due Process Clause would apply to protect Plaintiff's liberty interest in his placement into segregation.  *Sandin*, 515 U.S. at 486–87.  The Eighth Amendment supplies the explicit textual source of constitutional protection for claims governing a prisoner's health and safety.  *Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008).  Consequently, Plaintiff's substantive due process claim will be dismissed.

### 2.    Grievance Procedure

Plaintiff further claims that one of the grievance responses he received contradicted an earlier Segregation Behavior Review because "the response on the grievance by [Defendant] Nurkala she stated that [he] was approved for a START Program on April 2, 2025. But they placed [him] in segregation on April 2, 2025, on a false misconduct [while at] MBP [for] threatening behavior."  (Compl., ECF No. 1, PageID.7.)  Plaintiff claims that his "third step" grievance was also tampered with because one of the copies did not match the one he wrote and "the grievance [has] a

29

different grievance number." (*Id.*, PageID.7–8.)  Plaintiff alleges that in the grievance response, Defendant Nurkala "lied and stated that [he] was approved [for] the START Program." (*Id.*, PageID.8.)  Based on these allegations, the Court construes Plaintiff's complaint to raise a Fourteenth Amendment due process claim regarding his use of the grievance procedure at AMF.

Various courts have repeatedly held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt*, 459 U.S. at 467; *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x at 430; *Young v. Gundy*, 30 F. App'x 568, 569–70 (6th Cir. 2002); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  And, Michigan law does not create a liberty interest in the grievance procedure.  *See Olim*, 461 U.S. at 249; *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Thus, because Plaintiff has no liberty interest in the grievance process, any response, or lack thereof, to Plaintiff's grievances did not deprive Plaintiff of due process.

Accordingly, Plaintiff's Fourteenth Amendment due process claims regarding his use of the grievance procedure at AMF will be dismissed for failure to state a claim.

### Conclusion

Having conducted the review required by the PLRA, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court must next decide

whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons the Court concludes that Plaintiff's claims are properly dismissed, the Court also concludes that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court certifies that an appeal would not be taken in good faith.

A judgment consistent with this opinion will be entered.

Dated:  August 7, 2026          /s/ Phillip J. Green
                                PHILLIP J. GREEN
                                United States Magistrate Judge